## Case No. 9,489.

### The MERSEY.

[Blatchf. Pr. Cas. 187.] [1]

District Court, S. D. New York. July 28, 1862. [2]

PRIZE—VIOLATION OF BLOCKADE—ENEMY PROPERTY—LOG-BOOK—MUTILATION—NEUTRAL OWNER—PRETENDED SALE—CONSIDERATION.

1. The log-book was mutilated with intent to mislead and deceive with regard to the purposes of the voyage, in fraud of the belligerent rights of the United States, and the culpability thus shown, coupled with other marks of disguised and dishonest practice, demands the condemnation of vessel and cargo. Vessel and cargo condemned on the following grounds: (1) The vessel left the enemy's country as enemy property, and no attempted change of it to neutral property was made until her arrival in a neutral port. There is no evidence of a bona fide consideration paid for her purchase, or of a bill of sale executed, or of actual possession delivered to the alleged purchaser, or that he ever exercised acts of ownership over the vessel, or claimed to be her owner. (2) She had previously come out of an enemy port by evading the blockade, and was seized on her first voyage subsequent thereto. (3) Her ostensible voyage from a neutral port to a loyal port was simulated, and she was really bound to a blockaded port.

2. The rule of the English prize law is emphatic that the absence of a bill of sale from the ship's papers, and the want of proof of payment of the purchase money, in support of a claim by a neutral to an enemy vessel, are circumstances so strongly suspicious, and so vitally defective to a bona fide title to her, that the court, after condemnation of the vessel on the preparatory proofs, will not even allow further proof to be given in support of the title.

3. A transfer of property to a neutral by an enemy in time of war, or in aid of a contemplated war, is illegal, as in violation and fraud of vested belligerent rights.

4. The court will take judicial notice of the notorious course of trade between the neutral port of Nassau and the blockaded ports of the enemy.

[Cited in The William H. Northrop, Case No. 17,696.]

---

[1] [Reported by Samuel Blatchford, Esq.]
[2] [Reversed in Case No. 9,490.]

5. Suspicious circumstances as to the destination of the vessel commented on.

6. The intentional mutilation of the log-book of the vessel is convincing evidence of an attempt by her to perpetrate a fraud, in violation of the law of nations, for which she and her cargo are subject to forfeiture.

7. It will always be inferred that the papers of a vessel which have been destroyed related to the vessel and cargo, and that it was of material consequence to some unlawful interests that they should be destroyed.

8. The spoliation of papers is not per se a ground for necessarily condemning a vessel, but it raises a strong presumption of fraudulent purposes in those having charge of her, which will effect her condemnation if not satisfactorily accounted for.

9. The particulars of the mutilation of the log-book in this case stated.

In admiralty.

BETTS, District Judge. This vessel and cargo were captured on the 26th of April, 1862, in the Atlantic Ocean, two days' sail from Nassau, N. P., by the United States steamer Santiago de Cuba, and were sent into this port for adjudication as prize of war. A libel for their condemnation was filed on the 17th of May. On the 17th of June, Joseph Roberts, a resident merchant of Nassau, New Providence, intervened and filed his claim and answer and test oath to the libel, averring and testifying that he is a subject of the queen of Great Britain, and a resident of Nassau aforesaid, and owner of the said vessel and her tackle; that, when seized, the vessel was in the Gulf of Florida, about eighty or one hundred miles from land, and that she was laden with an honest cargo, belonging to Sawyer & Menendez, of Nassau, and was on an honest voyage from Nassau to Baltimore. Robert H. Sawyer and Ramon A. Menendez answer and claim that the cargo of the vessel belonged to them, that the voyage was a lawful one, and that the vessel was unlawfully seized. The test oath to the claim of Sawyer & Menendez is made by Montell, the consignee. The papers found on the vessel were, first, a certificate of British registry at Nassau, N. P., Bahamas. This certificate bears date at Nassau, the 15th of April, 1862. It states the vessel to be foreign built, and that her foreign name was Elizabeth. Second, the shipping agreement signed between William H. Sweeting, master, a mate, four seamen, and a cook, dated April 21, 1862. Third, a bill of lading and invoice of the cargo from the shippers Sawyer & Menendez, dated Nassau, April 20, 1862, consigned to J. I. Montell, of Baltimore. Fourth, a clearance at the port of Nassau of the same cargo for the port of Baltimore, April 21, 1862. Fifth, a letter of advice from the shippers to the consignee of the consignment, dated April 22, 1862. Sixth, the leaves of a portion of what appears upon its face to be a log-book of the voyage. The examination of the master, the mate, and one seaman, is also put in evidence, the same having been taken in preparatorio.

Upon the pleadings and proofs the libellants contended—First. That the vessel and cargo were subject to forfeiture, she having, on the voyage immediately preceding that of her capture, unlawfully run the blockade of the port of Charleston, existing at the time. Second. That the voyage which was being performed, and which purported to be to Baltimore, and with an honest neutral lading, was simulated and untrue, and the vessel and cargo on board being really enemy property and destined for the port of Charleston. Third. That the log-book was mutilated on the voyage for fraudulent purposes; and that the evidence in the case, furnished by the witnesses and the documents, was intended for deception and fraud as to the facts of the voyage and its objects. The claimants urged, on the contrary, that they were honest owners of the vessel and cargo, and that the whole adventure was truly represented in the answers and claims interposed.

The master testifies, in his examination in preparatorio, that he had no knowledge of the vessel until he saw her in Nassau, in March last, and that he was appointed her master by Sawyer & Menendez, who delivered possession of her to him as master. He states his belief that she was an American-built vessel, and that when she took out a British register in April her name was changed from the Elizabeth to the Mersey. He states that he heard that the schooner came to Nassau, with a cargo of cotton, from Charleston, on her last voyage; that he saw the cotton on board of her, and that she came to Nassau the last of March. He states that he had heard that while her name was the Elizabeth, she belonged to a man in Charleston by name Comall; that Roberts, the claimant of the vessel, resides at Nassau, where he has known him for four or five years; and that he knows of his ownership by the registry, and also heard that he was owner, but never heard anything about any sale. He states that he believes that the cargo belongs to Sawyer & Menendez, who have resided five or six years in Nassau; that the consignee, Montell, was formerly a resident of Nassau, but has resided in Baltimore for twenty-seven years; that he, the witness, has been acquainted with him from boyhood; that he does not believe that the consignee has any interest in the cargo; and that he knows nothing of any bill of sale of the vessel, or of any agreement about her, or of any charter-party. He further states that he knew that all the Southern ports were under blockade; that he understood that the vessel came to Nassau from Charleston, and, therefore, supposes she run the blockade there; that he knows no more of the history of the vessel than he has stated; and that no papers or writings on board of the vessel were altered or mutilated or suppressed on the voyage.

This brief synopsis of the evidence of the

master plainly manifests that the vessel was not put in his charge by her registered owner, and that he went into her service with a clear understanding that she was not to be sailed to Baltimore in the interest of Roberts, or of Montell, the nominal consignee of the cargo. The letter of instructions which she carried to Montell from Sawyer & Menendez evinced that an ulterior voyage remained to be performed by the vessel, other than a return to Nassau, had she reached Baltimore, and that the master was the confidential agent to be consulted by the consignee, "both in selling and also in purchasing a return cargo." This language evidently denoted that the master was not a mere carrier of the cargo to Montell, and also that Roberts acted in no way in fitting out or directing the voyage, that being exclusively the act of the shippers of the cargo, who were corresponded with by the master as the actual owners of the vessel. In answer to the 14th interrogatory, the master says: "The cargo is owned by Sawyer & Menendez, I believe, because they shipped it, and it is stated in the invoice that they were the shippers;" but to the 28th interrogatory he says: "If the vessel had arrived at her destined port, I suppose the cargo would have belonged to S. T. Montell, the consignee. The shippers, I suppose, took the chances of the market." The two suppositions of this last answer are incompatible with each other, and one of them with the statement of the witness in reply to the 14th interrogatory. No bill of sale or other conveyance of the vessel to Roberts was found with the papers on board, and no payment of a consideration on her transfer, nor any act of possession or ownership on his part, other than the registration of her in his name, was proved or asserted by Roberts. The testimony from the claimants is, that the master had been acquainted with Roberts four or five years in Nassau. The master offers no further evidence of the fact of sale than that he had seen the registry and had heard that Roberts was the owner; but, under these circumstances, the manner of proof leads to the implication that the hearsay of which the master testifies was from the shippers rather than from Roberts' own declaration or assertion of ownership, which Lord Stowell regarded as very feeble and equivocal evidence in proof of ownership. The Two Brothers, 1 C. Rob. Adm. 131. The rule of the English prize law is emphatic that the absence of a bill of sale from the ship's papers (it being the title-deed to the vessel), and the want of proof of payment of the purchase money, in support of a claim by a neutral to an enemy vessel, are circumstances so strongly suspicious and vitally defective to a bona fide title to her that the court, after condemnation of the vessel on the preparatory proofs will not even allow further proof to be given in support of the title. The Christine, 1 Spinks' Prize Cas. 82. For aught that appears before the court, this vessel retained the same character and ownership she bore when she left Charleston and entered the port of Nassau the last of March, and at the time the British registry on board of her was executed at Nassau; but, beyond that subsidiary principle is the higher doctrine that a transfer of property to a neutral by an enemy in time of war, or in aid of a contemplated war, is illegal, as in violation and fraud of vested belligerent rights. The Bernon, 1 C. Rob. Adm. 102; The Noydt Gedacht, 2 C. Rob. Adm. 137, note; The Minerva, 6 C. Rob. Adm. 396, 400, note; The Rosalie and Betty, 2 C. Rob. Adm. 343. The cargo on board was documented as neutral, and by the papers was directed to a neutral port; and unless it was on carriage under false and fraudulent semblance, with intent to cover and disguise its character, and to convey it to an enemy port, or in some other way fraudulently evade the belligerent right of the United States, it must be restored to the claimants thereof.

The question, then, specifically touching the suit for the condemnation of the cargo, rests upon the inquiry whether it is virtually shown to be enemy property, or to have been exported from Nassau with the view and purpose of evading the blockade and carrying it to the enemy, or whether any deception has been practiced in relation to its transportation, calculated and intended to mislead the government and disguise the true character of the voyage and violate the belligerent rights of the United States. The intrinsic and extraneous circumstances insisted upon by the libellants as indicating a culpable intention in the vessel and voyage consist essentially in the imputation that it was matter of notoriety at Nassau, and personally known to all the vessel's company, that the Southern ports were in a state of blockade, and that the court is judicially informed that the open and steady course of navigation and trade at the time of the fitting out of the vessel at Nassau was that of running cargoes in and out of Charleston in violation of the blockade of that port by neutral and enemy vessels notoriously and publicly employed in and prosecuting that object and pursuit; and that this vessel on her last voyage evaded the blockade of Charleston with an enemy cargo, and immediately on her arrival at Nassau assumed a neutral ownership, and was reladen with a cargo specially adapted to the wants of Charleston, and of the character of the cargoes constantly being shipped from Nassau to Charleston in violation of the blockade. Sir William Scott, in The Rosalie and Betty, 2 C. Rob. Adm. 344, says that the judiciary is not to shut its eyes "to what is generally passing in the world—to that obvious system of covering the property of the enemy which, as the war advances, grows notoriously more artificial. Not to know these facts, as matters of frequent and not unfamiliar occurrence, would be not to know the general nature of

the subject upon which the court is to decide; not to consider them at all, would not be to do justice." The fact is proved that a large quantity of salt, particularly, was laden directly from a vessel bringing it from Liverpool on board of the Mersey, and the circumstances attending the discharge of the Mersey and the reloading her for her outward voyage strongly import that the transactions were under a common interest and superintendence. The master had been for years acquainted with Roberts and with Sawyer & Menendez, yet treated with the latter as owners of the vessel and cargo, and was to act as their agent in the disposition of the cargo and in obtaining a return one at the port of alleged destination. The mate, contrary to the assertion of the master, considered him to have been appointed by Roberts. So hurried and confused does the business seem to have been in its transaction, that the master says, on his examination, that he does not know the capacity of the vessel. The mate says that she was of about fifty tons burden, and the steward estimated her at two hundred tons. The shipping agreement with the crew is from Nassau to Baltimore and back, without specification of time of employment; and the letter of instruction and advice to the consignee, for the disposition of the adventure, gives no other directions as to a return cargo than a reference to the counsel and advice of the master. Such obscurity and looseness in conducting a mercantile voyage gives occasion for suspicion that something was connected with it, and designed to be carried into effect by it, which was cautiously kept out of view; and the notorious course of trade and intercommunication between Nassau and Charleston, from the breaking out of the war to this day, gives occasion to a strong presumption that it was purposed, on the part of those who managed the Mersey, that she should fulfil the business on which she started at Charleston, by returning directly back to the place of her departure with a cargo adapted to that market. It would be no uncommon device to adopt a circuitous back track, and remove from the papers all outward marks of culpability in its initiation.

The evidence bearing upon this branch of the inquiry, although negative in form, is efficient in character if it sustains the interpretation put upon it by the libellants. They charge that the log-book, arrested with the vessel, has been mutilated and spoliated so as to destroy or conceal entries evidently made upon it originally. Such an act, if committed, supplies convincing evidence of an attempt by the vessel to perpetrate a fraud or deceit, in violation of the law of nations, for which she and her cargo are subject to forfeiture. The master of the vessel testifies that she was captured and taken in tow at about 30° north latitude, but he does not remember the longitude. The mate answers the interrogatory in about the same language; and the steward says he does not know and never heard what was the longitude of the capture, but it was somewhere in the Gulf Stream. And they all say that the vessel was thence taken to Port Royal. It is marked on the log of the vessel to have been latitude 30° 17', longitude 79° 33', at 3½ p. m., when she was taken in tow by the captors, and that she, in tow of the capturing vessel, made land the next morning between nine and ten o'clock, against heavy weather. The portion of the log-book taken with the vessel notes the latitude of the place of departure of the vessel to be 27° 7', and the longitude 79° 13'. The latitude of Baltimore is laid down on the charts as 39° 17' N., and the longitude 76° 36' W., and Charleston is in longitude 79° 54', and latitude 32° 47'. It will be perceived, by the statement of the longitudes of the point of departure of the vessel and that of her alleged point of destination, that she had, between 10 o'clock a. m. of Thursday and 3½ p. m. of Saturday, varied her position towards the coast of the blockaded states, southerly, off and below Charleston, about three degrees of north latitude and one degree of west longitude, and was three degrees west of the longitude of Baltimore. No reason or excuse is assigned for such apparent approach to the coast, nor is it shown to have been the regular line of navigation for Baltimore. Indeed the ship's company deny all knowledge of her position in that respect. Whether such ignorance is real or simulated might be explained by a perfect log, recording the route intended to be run on the voyage, and the impediments or causes preventing the fulfilment of such purpose.

This renders the solution of the inquiry pertinent and important, whether the log found on board had been mutilated or varied surreptitiously after the vessel left Nassau. Her transit directly in front of the line of blockaded ports would pass through about eleven degrees of latitude. The English and American prize law regards the act of destroying or mutilating the ship's papers (among which log-books rank as of primary importance) to be proof of mala fides in the actors, and to demand the worst presumption against those concerned in it. It will always be inferred that the papers relate to the ship or cargo, and that it was of material consequence to some unlawful interests that the papers should be destroyed or suppressed. The suppression or spoliation of papers is not now considered in the American or English courts as, per se, the necessary damnatory cause of forfeiture of vessel and cargo (The Pizarro, 2 Wheat. [15 U. S.] 227), but it raises a strong presumption of fraudulent purposes in those having charge of the ship and papers, which will effect the condemnation of the prize if not satisfactorily explained and accounted for. The Two Brothers, 1 C. Rob. Adm. 131; The Hunter, 1 Dod. 480.

Notwithstanding the exceedingly positive assertion of the master, mate, and steward,

in their examination in preparatorio, that no alteration or destruction of any papers on board had been made, the log is produced palpably mutilated by having the first leaf torn or cut from the paper book out of which the log is formed, so as to leave marks of writing or figuring visible upon the first page thereof, and leading to a strong presumption that other entries had also been made upon the second page, because that method of keeping the log is subsequently followed to the time of the capture of the vessel. The other half of that sheet, the left side of the outward one, remains entire, and the whole book is stitched through the middle folding of the same, the broken edge of the displaced leaf showing marks of writing still upon it outside of the stitching which fastened it. Two circumstances thus apparent on the face of the log, as it stands, demand clear explanation from the testimony of the master and mate. One is, why no regular entry is made by name of the port of departure on the voyage and of the port of destination, if really a fair trading adventure was contemplated between two neutral ports. Another particular gathered from the dismembered log contrasts very unfavorably with the positive averments of the master and mate in their examinations. The note on the bottom of the first written entry in the log represents the longitude of the vessel at the hour of her departure (10 a. m., Thursday, April 24, 1862) to be 79° 13', and on Saturday, April 26, when taken in tow by the captors, the entry represents the vessel to be in longitude 79° 33', only twenty minutes west of her point of departure, whilst the mate testifies that she was arrested about one hundred miles from land, and the master, in the face of that entry, swears he had no knowledge of the longitude of the place of her capture. It is, moreover, observable that the remarks heading the first two remaining pages of the log omit naming the month as well as the place of beginning of the voyage, leaving the implication very strong that those particulars, as well as others tending to shed light upon the enterprise, had been duly registered in the first opening of the log account thereof, and that the after leaves had been continued as if the preliminary facts and others characterizing the voyage were already duly recorded. I therefore hold that, upon the evidence, the log must have been thoughtfully changed or spoliated, and that in judgment of law such alteration or suppression was made with intent to mislead and deceive with regard to the purpose of the voyage, and is, therefore, fraudulent, as against the rights of the United States as a belligerent power, and affords evidence of culpability which, coupled with other marks of disguised and dishonest practices, authorizes and demands the condemnation of the vessel and cargo.

Without dwelling longer upon special points of law or fact in the case, the result is—

1st. The vessel left Charleston as enemy property, and no attempted change of it to neutral property was made until her arrival in Nassau. There is no evidence of a bona fide consideration paid for her purchase, or of a bill of sale executed thereof, or of actual possession delivered to the alleged purchaser, or that he ever exercised acts of ownership over the vessel, or claimed to be her owner.

2d. She came out of Charleston by evading the blockade of the port, and was seized on her first voyage subsequent thereto. The Christiansberg, 6 C. Rob. Adm. 376, 382, notes; The General Hamilton, Id. 62.

3d. The alleged voyage from Nassau to Baltimore was simulated and unreal and was meant for a blockade port. The mutilated log, the description of cargo on transportation, the mode of fitting out and conducting the enterprise, the notorious course of dealing and trade to and from Nassau since the war, and the misrepresentations in the log and in the testimony of the master and mate of the approach of the vessel, when captured, towards Charleston, are facts justifying strong suspicions of her integrity and honesty, and must prevail against her in the absence of exculpatory proof.

For the causes indicated I adjudge the vessel and cargo confiscable in this suit, and decree their condemnation and forfeiture accordingly.

This decree was reversed on appeal by the circuit court, July 17, 1863. [Case No. 9,490.]